**BORSCHOW HOSPITAL AND MEDICAL SUPPLIES, INC.,**
Plaintiff—Appellant,

v.

**CESAR CASTILLO INC., et al.,**
Defendants—Appellees.

No. 96–1113.

United States Court of Appeals,
First Circuit.

Heard July 30, 1996.

Decided Sept. 23, 1996.

Fernando L. Gallardo, with whom Harry E. Woods, Geoffrey M. Woods, Woods & Woods, Hato Rey, PR, and Carlos R. Iguina–Charriz were on brief, Guaynabo, PR, for appellant.

Donald R. Ware, with whom Richard M. Brunell and Foley, Hoag & Eliot, were on brief, Boston, MA, for appellee Becton Dickinson and Company.

Edilberto Berríos–Pérez and Luis Fernández–Ramírez, San Juan, for appellees César Castillo, Inc., Umeco, Inc., José Luis Castillo, Ivonne Belaval de Castillo, César Castillo, Jr., Aracelis Ortiz de Castillo and María Isabel González.

Before SELYA, Circuit Judge, TORRES * and SARIS,** District Judges.

SARIS, District Judge.

Plaintiff–Appellant Borschow Hospital & Medical Supplies, Inc. is a distributor of a line of medical and surgical products supplied by Defendant–Appellee, Becton Dickinson and Company, in Puerto Rico. Borschow claims that Becton Dickinson violated the Puerto Rico Dealers Act, 10 L.P.R.A. § 278, also commonly known as "Law 75," by granting additional distributorships in violation of its allegedly exclusive Distributorship Agreement.[1] Although the Distributorship

---

* Of the District of Rhode Island, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. The additional distributorships were granted to Defendants–Appellees Cesar Castillo, Inc. and UMECO, Inc., which filed a separate brief. At oral argument, Becton Dickinson argued for the Appellees as a group. Where we refer to Becton

Agreement contained a clear non-exclusivity provision and integration clause, Borschow contends that the district court erred under Puerto Rico's parol evidence rule when it excluded an unsigned written memorandum sent prior to the signing of the agreement as evidence that the parties actually intended the distributorship to be exclusive.

Borschow also claims that Becton Dickinson engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by threatening to discontinue a supply of a line of its products (the tying products) unless Borschow also carried its syringe line (the tied product) and dropped that of a competitor.

The district court granted summary judgment for Becton Dickinson on both claims. We affirm.

## I. STATEMENT OF THE CASE

### A. Facts

■ Reviewing the factual record in the light most favorable to the nonmoving party, as we must at summary judgment, *see Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992), we treat the following facts as controlling, noting, however, that Becton Dickinson disputes many aspects of this account.

A major supplier of medical products in Puerto Rico, Borschow contracted with Parke Davis & Company ("Parke Davis") on May 1, 1985 to distribute a line of medical and surgical products manufactured by its subsidiary, Deseret Medical, Inc. (the "Deseret Line"). In mid–1986, Becton Dickinson acquired Deseret and assumed Parke Davis' obligations under the distribution agreement as an assignee. This dispute turns in large part on the content of that agreement.

The distribution agreement executed by Borschow and Parke Davis ["Distribution Agreement"], includes two provisions of interest here. First, it provides that "Company [i.e., Parke Davis] hereby appoints Dis-

tributor [i.e., Borschow] and the Distributor hereby accepts appointment, as the Company's *nonexclusive* independent distributor of the Products for Regular Business in the Territory [i.e., Puerto Rico] during the term of this Agreement." Distribution Agreement, § 2.1.2 (emphasis added). Second, the contract included the following integration clause:

*Integration:* The terms and provisions contained in this Agreement, including all Schedules attached hereto and Company's Standard Terms and Conditions of Sale in effect, from time to time, constitute the entire agreement and is the final expression of intent between the Parties relating to the subject matter hereof and supersede, all previous communications, representations, agreements, and understandings, either oral or written, between the Parties with respect to the subject matter thereof. No agreement or understanding varying or extending this Agreement will be binding upon either Party hereto unless in writing, wherein this Agreement is specifically referred to, and signed by duly authorized officers or representatives of the respective Parties.

*Id.* § 9.10. Borschow's president, Jonathan Borschow, initially refused to sign any contract that included a non-exclusivity provision. However, in negotiations prior to execution of the Distribution Agreement, Robert Vallance, Deseret's Regional Director for Canada/Latin America, assured Mr. Borschow that his distributorship would be exclusive. Vallance promised him that he would receive a letter from Parke Davis promising exclusivity. When that letter was not forthcoming, Mr. Borschow telephoned Vallance and inquired about the delay. Vallance told Mr. Borschow that the people in "Morris Plains," the corporate headquarters of Warner Lambert, Parke Davis' parent company, were considering the matter.

After that conversation, Mr. Borschow received a draft of the Distribution Agreement, which included the non-exclusivity term. He

Dickinson in the course of this opinion, we mean our statements to apply to Appellees as a group except where otherwise indicated. Similarly, to avoid confusion where referring to the testimony

of Jonathan Borschow, Borschow's president, we will refer to him as Mr. Borschow and to the company simply as Borschow.

again objected to Vallance but was told that the "contract cannot, it will not be changed. The people in Morris Plains will not countenance it." However, Vallance reassured Mr. Borschow that he would send a document that would outline the "true" basis for their business relationship, including a promise that Borschow's distributorship would be exclusive.

Within a matter of days, Mr. Borschow received a two-page undated and unsigned outline. The outline specifies that one of the supplier's obligations is to "sell exclusively to the DISTRIBUTOR and refrain from selling to other DISTRIBUTORS or clients in the territory while the AGREEMENT is in effect." The outline neither explicitly mentions Mr. Borschow or Parke Davis nor refers to the May 1 Distribution Agreement. Borschow testified that he executed the Distribution Agreement approximately two weeks after he received the outline.[2]

From the execution of the agreement in 1985 to 1986, Borschow remained Parke Davis' exclusive distributor of the Deseret line. After Becton Dickinson's acquisition of Deseret in mid–1986, no changes were made in the relationship until November 1989, when Becton Dickinson granted distributorships to UMECO, Inc. and César Castillo, Inc.

Moreover, according to Borschow and his salespeople, at approximately the same time that the additional distributors were established in November 1989, Becton Dickinson demanded that Borschow cease distributing the Monoject Syringe & Needle Line, made by a Becton Dickinson competitor, and begin carrying the Becton Dickinson syringe line. Becton Dickinson also threatened that if Borschow did not meet this demand, it would no longer be supplied with the Deseret line. However, Becton Dickinson did not carry through on this threat. Although Borschow refused to drop Monoject, Becton Dickinson continued to supply Deseret products to Borschow.

## B. Proceedings Below

Borschow brought an action in federal district court for the District of Puerto Rico on February 6, 1990, alleging that Becton Dickinson's termination of Borschow's "exclusive" distributorship violated Law 75 and that Becton Dickinson's threat to tie the Deseret line to its syringe line violated the Sherman Act. Borschow also alleged a conspiracy with Castillo and UMECO in restraint of trade and attempted monopolization. Federal jurisdiction was invoked on the basis of a federal question and diversity of citizenship.

On September 24, 1990, the district court permitted discovery limited to the threshold issue as to whether Borschow's distributorship was exclusive. On January 15, 1991, Becton Dickinson moved for summary judgment, asserting that taking these facts in the light most favorable to Plaintiff, Borschow cannot evade the effect of its written contract providing for non-exclusivity. If Borschow's contract was non-exclusive, according to Becton Dickinson, the Law 75 claim fails as a matter of law. In addition, Becton Dickinson argued that the outline was extrinsic evidence of the contracting parties' intent that could not be considered on summary judgment because of Puerto Rico's parol evidence rule.

The motion was referred to a magistrate judge, who issued a report and recommendation denying summary judgment on the ground that the extrinsic evidence raised issues of fact regarding whether the agreement provided for exclusivity. The district court (Acosta, J.) initially adopted the magistrate judge's recommendation without comment, but on a motion for reconsideration, the court (Casellas, J.) granted partial summary judgment for Becton Dickinson.[3] The court held that Puerto Rico's parol evidence rule barred consideration of the outline and

---

2. At Mr. Borschow's deposition, the parties marked the Distribution Agreement as BDX–1 and the undated outline as BDX–3, and throughout its brief Appellant refers to the documents by those numbers. To avoid confusion, however, the Court will refer to BDX–1 and BDX–3 as the

Distribution Agreement and the Outline, respectively.

3. Judge Acosta took senior status before the motion for reconsideration, and the case was reassigned to Judge Casellas.

that the contract unambiguously provided for a non-exclusive distributorship. *Borschow Hosp. & Medical Supplies, Inc. v. César Castillo, Inc.*, 882 F.Supp. 236, 239–40 (D.P.R.1995). In a subsequent order, the court granted partial summary judgment for Becton Dickinson on the antitrust claims due to lack of evidence of tying, anticompetitive injury or conspiracy and dismissed the pendent state law claims. Borschow timely appealed the judgment.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment *de novo. Werme v. Merrill*, 84 F.3d 479, 482 (1st Cir.1996). The standard is well-rehearsed and familiar. "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)), *cert. denied,* ––– U.S. –––, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "In operation, summary judgment's role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202

(1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted). We "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. The Law 75 Claim

"The legislature of Puerto Rico enacted Law 75 to protect distributors, agents, concessionaires and representatives of a product or service in Puerto Rico.... [M]ore specifically, Law 75 was intended to protect dealers who built up a market, from suppliers who wish to appropriate their established clientele." *Medina & Medina v. Country Pride Foods, Ltd.*, 825 F.2d 1, 2 (1st Cir. 1987). "Law 75 provides that, notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." *General Office Prods. Corp. v. Gussco Mfg. Inc.*, 666 F.Supp. 328, 328 (D.P.R.1987) (citing 10 L.P.R.A. § 278(a)).

Law 75 has proved fertile ground for litigation, and we recently have had occasion to consider its application to circumstances analogous to those presented here. Although "non-exclusive distributors are entitled to protection under Law 75," *Vulcan Tools of Puerto Rico v. Makita U.S.A., Inc.*, 23 F.3d 564, 569 (1st Cir.1994), "[i]t is equally true ... that Law 75 does not operate to convert non-exclusive distribution contracts into exclusive distribution contracts." *Id.* (citing *Gussco*, 666 F.Supp. at 331). As we said in *Vulcan Tools*, "the 'established relationship' between dealer and principal is bounded by the distribution agreement, and therefore the Act only protects against detriments to contractually acquired rights." *Id.* at 569.

This case turns on whether Borschow and Parke Davis (now Becton Dickinson) contracted for a non-exclusive or exclusive distributorship. If the former, Borschow cannot prevail on its claim that Law 75 prohibits Becton Dickinson from supplying Deseret medical products to other distributors. *See Vulcan Tools,* 23 F.3d at 569 (Law 75 did not prevent supplier from establishing additional distributorships in Puerto Rico where non-exclusive distributor was already operating even if existing distributor suffered economic harm as result); *Nike Int'l Ltd. v. Athletic Sales, Inc.,* 689 F.Supp. 1235, 1238–39 (D.P.R.1988) (where distributorship contract between Nike and distributor provided for notice of renewal from distributor and distributor failed to provide such notice, Law 75 did not bar termination of distributorship contract).

■ As a civil law jurisdiction, Puerto Rico eschews common law principles of contract interpretation in favor of its own civil code derived from Spanish law. *See Guevara v. Dorsey Labs., Div. of Sandoz, Inc.,* 845 F.2d 364, 366 (1st Cir.1988) ("The Supreme Court of Puerto Rico has made clear that the common law of the United States is not controlling when filling gaps in the civil law system."); *Gussco,* 666 F.Supp. at 332. Thus, we turn to Civil Code Article 1233, which "determines the manner in which courts should interpret contracts under dispute as to the meaning of their terms." *Hopgood v. Merrill Lynch, Pierce, Fenner & Smith,* 839 F.Supp. 98, 104 (D.P.R.1993), *aff'd,* 36 F.3d 1089 (1st Cir.1994) (table). Article 1233 provides:

> If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.
>
> If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail.

31 L.P.R.A. § 3471 (1991). "Under Puerto Rican law, an agreement is 'clear' when it can 'be understood in one sense alone, without leaving any room for doubt, controversies or difference of interpretation....'" *Executive Leasing Corp. v. Banco Popular de Puerto Rico,* 48 F.3d 66, 69 (1st Cir.) (quot-ing *Catullo v. Metzner,* 834 F.2d 1075, 1079 (1st Cir.1987)) (internal quotation marks omitted), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995); *see also Heirs of Ramírez v. Superior Court,* 81 P.R.R. 347, 351 (1959).

Citing the Puerto Rico Supreme Court in *Marina Ind., Inc. v. Brown Boveri Corp.,* 114 P.R. Dec. 64, 72 (1983) (official translation), several courts have interpreted Article 1233 to be "strict in its mandate that courts should enforce the literal sense of a written contract, unless the words are somehow contrary to the intent of the parties." *Hopgood,* 839 F.Supp. at 104; *see also Vulcan Tools,* 23 F.3d at 567 ("When an agreement leaves no doubt as to the intention of the parties, a court should not look beyond the literal terms of the contract.").

This interpretation of Article 1233 is complemented by Puerto Rico's parol evidence rule, P.R.Laws Ann. tit. 32, App. IV, R. 69(B) (1983) ("Rule 69(B)"), which provides:

> When in an oral or written agreement, either public or private, all the terms and conditions constituting the true and final intention of the parties have been included, such agreement shall be deemed as complete, and therefore, there can be between the parties, or successors in interest, no evidence extrinsic to the contents of the same, except in the following cases:
>
> (1) Where a mistake or imperfection of the agreement is put in issue by the pleadings;
>
> (2) Where the validity of the agreement is the fact in dispute.
>
> This rule does not exclude other evidence of the circumstances under which the agreement was made or to which it is related such as the situation of the subject matter of the instrument or that of the parties, or to establish illegality or fraud.

We have interpreted this rule in tandem with Article 1233 to require courts "to ignore [parol] evidence 'when the agreement ... is clear and unambiguous.'" *Mercado–García v. Ponce Fed. Bank,* 979 F.2d 890, 894 (1st Cir.1992) (quoting *Catullo,* 834 F.2d at 1079).

Recently, we have held that these provisions bar consideration of extrinsic evidence to vary the express, clear, and unambiguous terms of a contract. *See Executive Leasing Corp.,* 48 F.3d at 69–70 (refusing to consider

parol evidence regarding implied loan term barring leasing company from dealing with other banks where contract did not include restriction but did include clear integration clause); *Vulcan Tools,* 23 F.3d at 564–68 (where contractual term providing for "non-exclusive" distributorship was clear and unambiguous, there was no need to consider extrinsic evidence of promise to limit number of distributors even absent contractual integration clause); *see also Hopgood,* 839 F.Supp. at 103–05 (holding that term "indefinite" used in employment contract clearly signified employment at will and refusing to consider parol evidence of implied guarantee of three-year minimum employment).

■ This line of cases effectively parries the main thrust of Borschow's appeal. The Distribution Agreement clearly and unambiguously gives Borschow a "non-exclusive" distributorship. The integration clause, specifying that the terms and provisions of this Distribution Agreement constitute the "entire agreement" and "the final expression of intent," nullifies any other oral or written understandings reached between the parties. Crediting Mr. Borschow's testimony that he received the outline from Vallance promising an exclusive distributorship, as we must on summary judgment, we hold that the integration clause rendered inoperative any such side-agreement, and we are barred from considering the extrinsic evidence by Rule 69(B).

Borschow attempts to evade the effect of this settled precedent by arguing that the entire agreement, properly construed, includes both the Distribution Agreement and the Outline. Because the documents contain mutually inconsistent terms, Borschow contends that Article 1233 of Puerto Rico's Civil Code permits liberal consideration of extrinsic evidence as to the parties' intent to resolve contractual ambiguity. To some extent, Borschow's reliance on this Civil Code principle finds some support in Puerto Rico case law. The Puerto Rico Supreme Court has held that:

> The intention of the parties is the essential test provided in the Civil Code to fix the scope of contractual obligations. This test of intention is so essential in the interpre-

tation of contracts that the Code proclaims its supremacy in providing that the evident intention of the parties shall prevail over the words, even where the latter would appear contrary to the intention. . . .

*Merle v. West Bend,* 97 P.R.R. 392, 399 (1969). However, that court subsequently clarified that "[t]he strict mandate of the cited art. 1233 obliges us to abide by the literal meaning of the terms of the contract when, as in the present case, they leave no doubt as to the intention of the contracting parties." *Marina Ind. Inc. v. Brown Boveri Corp.,* 114 P.R. Dec. 64 (1983) (official translation).

In rejecting essentially the same argument now made by Borschow, we applied this principle in *Executive Leasing Corp.:*

> The plaintiffs concede the loan agreement is clear. They argue, however, that the written agreement was not in fact the entire agreement, and that we must consider extrinsic evidence of the parties' intent with respect to integration. . . . Yet to consider extrinsic evidence at all, the court must first find the relevant terms of the agreement unclear. That requirement not being met, the district court correctly went no further.

48 F.3d at 69 (excluding extrinsic evidence of exclusive dealing condition and of "actual practice" of parties); *accord Hopgood,* 839 F.Supp. at 106 (explaining that *Marina* and *Merle* support principle that under Article 1233 the clear terms of the contract are the "embodiment of the indisputable intent of the parties as they entered into the contract").

■ For the third time, we mean what we say, and say what we mean: extrinsic evidence of the parties' intent is inadmissible in the face of a clear and unambiguous contract term under Puerto Rico Law. Because Borschow's distributorship was non-exclusive as a matter of law, the district court properly granted summary judgment for Appellees on the Law 75 claim.[4]

## C. Antitrust Claim—Tying Arrangement

Asserting a *per se* violation of Section One of the Sherman Act, Borschow contends that

---

4. While the Puerto Rico parol evidence rule permits extrinsic evidence to establish fraud, Bor-

schow does not allege that it was fraudulently induced into signing the Distribution Agreement.

Becton Dickinson threatened to withhold sale of its patented Deseret line of medical products (the tying product) unless Borschow dropped the Monoject product and carried instead its own syringe line (the tied product).[5] Contending that this is "the case of the tie that didn't bind," Becton Dickinson argues that a threat alone is insufficient to constitute an illegal tying arrangement. We agree.

"Section 1 of the Sherman Act prohibits a seller from 'tying' the sale of one product to the purchase of a second product if the seller thereby avoids competition on the merits of the 'tied' product. *See* 15 U.S.C. § 1 ('Every contract ... in restraint of trade or commerce ... is declared to be illegal.')" *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1178 (1st Cir.1994). "There are essentially four elements to a *per se* tying claim: (1) the tying and the tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product." *Id.* at 1178–79.[6]

■ The fatal flaw in Borschow's tying claim is that Becton Dickinson never with-

held its Deseret line. Although Borschow has adduced evidence of various threats by Becton Dickinson, it is undisputed that these threats were not carried out. Permitted to carry both the Deseret line and the Monoject line, Borschow was never injured by the threat. *See Wells Real Estate, Inc. v. Greater Lowell Board of Realtors*, 850 F.2d 803, 814 (1st Cir.) (holding that plaintiff must have been injured by anticompetitive act to have standing under antitrust laws), *cert. denied*, 488 U.S. 955, 109 S.Ct. 392, 102 L.Ed.2d 381 (1988).

As a result, the second key element discussed above—evidence of a tie—is missing:

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984); *see also T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 822–23 (11th Cir.) ("[F]or a tie to exist a seller must withhold product A unless the buyer also selects product B. Only after the existence of a tie is shown is it necessary to determine whether an illegal

---

Nor is a claim of equitable estoppel properly before us. Borschow contends for the first time on appeal that Becton Dickinson should be estopped from denying the existence of an exclusive contract because of the conduct of its agent, Vallance. As this argument was not made below, it is waived. *Executive Leasing Corp.*, 48 F.3d at 70.

5. See Amended Verified Complaint ¶¶ 28–29. Plaintiff also asserts a claim under the Clayton Act, § 3, that we need not separately address. *See Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 793 (1988) (pointing out that essential elements of unlawful tying arrangement are same for alleged violations of Sherman Act § 1 or Clayton Act § 3). In addition, Borschow conceded at oral argument that our holding that the Distribution Agreement was non-exclusive would foreclose relief on all of its antitrust claims except its tying claim.

6. Borschow does not articulate a "rule of reason" theory of tying liability. Although the amended verified complaint contains conclusory allegations that Becton Dickinson's conduct generally had an adverse effect on competition, there is no evidence in the record to support the allegation that the threats of tying had such an adverse impact, or to provide a basis for providing further discovery pursuant to Fed.R.Civ.P. 56(f). *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29–31, 104 S.Ct. 1551, 1567–68, 80 L.Ed.2d 2 (1984) (noting that in absence of *per se* liability, antitrust plaintiff must prove that defendant's conduct had an "actual adverse effect on competition"); *R.W. International Corp. v. Welch Food, Inc.*, 13 F.3d 478, 487–88 (1st Cir.1994) (rejecting request for further discovery despite conclusory allegations of antitrust injury where plaintiff distributors were in same position as defendant to ascertain effect of conduct at issue).

tying arrangement exists.") (footnote omitted), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *Cia Petrolera Caribe, Inc. v. Avis Rental Car Corp.,* 576 F.Supp. 1011, 1016 (D.P.R.1983) ("Coercion is an essential element of any tying arrangement, i.e., forcing the purchaser or lessor to take the unwanted tied product along with the tying product."), *aff'd,* 735 F.2d 636 (1st Cir.1984).

Where a tying product has not been withheld, there is no tie. "There is no tie for any antitrust purpose unless the defendant improperly imposes conditions that explicitly or practically require buyers to take the second product if they want the first one." 10 Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and their Application* ¶ 1752b, at 280 (1996). Thus we hold that there is no genuine issue of material fact with respect to Borschow's tying claim.[7]

### III.  CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment is **AFFIRMED.**

---

**7.** This holding also disposes of Borschow's discovery claim. Borschow contends that the district court abused its discretion by refusing to allow further discovery. However, no amount of discovery would uncover evidence of a non-existent tie.